UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 23-cr-00195 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| DEMARCUS C EVANS (01) | MAGISTRATE JUDGE HORNSBY |

### REPORT AND RECOMMENDATION

**Introduction**

Demarcus Evans ("Defendant") is charged with one count of possession with intent to distribute methamphetamine, one count of possession of a firearm in furtherance of drug trafficking, and one count of possession of a firearm and ammunition by a convicted felon. The charges arise out of a traffic stop and search of Defendant's vehicle. Before the court is Defendant's Motion to Suppress (Doc. 20). Defendant argues that all evidence seized as a result of the stop should be suppressed because the traffic stop was impermissibly prolonged, officers did not have probable cause to search the vehicle, and the search constituted a trespass. For the reasons that follow, it is recommended that the motion be denied.

**Relevant Facts**

A hearing was held on the motion to suppress. Testimony at the hearing, along with audio/video recordings of the traffic stop, established the following facts. In September of 2022, DEA agents opened an investigation into a suspected methamphetamine trafficking organization believed to be operating around Shreveport Bossier. Tr. 3-4. Agents obtained

wiretaps for the targets of the investigations. The agents conducted traffic stops related to conversations intercepted from the wiretaps. Between September of 2022 and June of 2023, agents recovered over 500 grams of methamphetamine as a result of the investigation. Tr. 4-5.

On June 6, 2023, agents were conducting a wiretap on Tesse Sears, one of the main targets of the investigation. They intercepted a call between Sears and an unknown male. Based on the conversation, the agents believed that the man was traveling to obtain an unspecified amount of methamphetamine and possibly powder cocaine. Tr. 5-7; Gov. Ex. 1 (audio recording of telephone conversation).

The agents traced the telephone number, which returned Defendant as a subscriber. The agents then used a database and identified a Nissan Titan that was registered to Defendant. Tr. 7-8. The agents ran the Nissan through a License Plate Reader ("LPR") database. Based on hits returned from the LPR, the agents determined that Defendant drove westbound on I-20 to Dallas and then several hours later returned eastbound on I-20 toward Shreveport. Tr. 8-11. The agents knew that Dallas is a source city for narcotics. Tr. 11.

The agents established surveillance along I-20 eastbound and contacted Louisiana State Police marked units in anticipation of a traffic stop. Tr. 12. Louisiana State Trooper Chris Perry is a DEA Task Force office employed with the Louisiana State Police. He was the DEA agents' point of contact with the troopers who were going to make the traffic stop. Tr. 11. He was familiar with the case and had access to the LPR hits. Tr. 12.

Perry contacted Louisiana State Trooper Justin Wardell and told Wardell that deputies believed Defendant was bringing a large amount of narcotics into Louisiana. Perry told Wardell to wait at the state line and conduct a traffic stop on Defendant's Nissan. Tr. 46. Perry sent Wardell photos of the LPR hits and identifying information for Defendant. Tr. 47-48. Wardell checked Defendant's criminal history and found that Defendant had a lengthy criminal history that included drug charges, violence, and a second-degree murder charge. Tr. 49.

Wardell waited at the state line until he saw Defendant's vehicle. When he first saw the vehicle, it was moving at a higher rate of speed than all of the vehicles around it. Tr. 50. Wardell pulled out onto the interstate to follow Defendant. He got up to a speed of approximately 85 miles per hour while trying to catch up to Defendant. The speed limit in the area was 70 miles per hour. Tr. 51. Defendant was changing from lane to lane, getting very close to other vehicles before changing lanes to pass them. Tr. 58. When Wardell caught up to Defendant, he manually activated his dash camera and recorded Defendant repeatedly crossing the white fog line. Tr. 54.

Wardell initiated a traffic stop of Defendant. Defendant and Wardell stopped on the side of the interstate. Wardell exited his vehicle and approached Defendant's vehicle on the passenger side. Tr. 57. He introduced himself to Defendant and told him that the reasons for the stop were speeding, improper lane usage, and following too close. Tr. 58. Wardell asked Defendant for his license and registration. While Defendant located the paperwork, Wardell asked Defendant about his travel plans. Defendant said that he took

his brother to Dallas. Defendant produced his paperwork, and Wardell asked him to exit the vehicle. Tr. 60.

Wardell and Defendant walked to the front of Wardell's patrol car. Wardell asked Defendant whether he had past arrests for guns, and Defendant said he did not. Tr. 60. Wardell patted Defendant down then went to his patrol vehicle to fill out a consent to search form for Defendant's vehicle. Tr. 61. He returned to where Defendant was standing and asked more questions about Defendant's travel plans. Defendant told Wardell that his brother lived in Texas, and he was retuning from taking his brother to Texas. Wardell asked Defendant how his brother got to Shreveport, and Defendant did not answer. Defendant said that his brother had to attend a funeral, and Defendant drove him to the funeral. Wardell found Defendant's explanation of the reason for his trip confusing and inconsistent. Tr. 64-64. Wardell asked for consent to search the vehicle, but Defendant refused. Wardell radioed to request a K-9 unit to come to the scene. Tr. 63-64.

Caddo Parish Deputy Brock Bonds arrived at the scene in response to the request for a K-9 unit. He walked his dog, Samos, around Defendant's vehicle to conduct an open-air sniff. At one point during the sniff, Samos put his front paws on the vehicle. Samos alerted to an odor on the passenger side of the vehicle. Tr. 27-28, 64. Wardell searched the vehicle. Tr. 64. Wardell found in the backseat a backpack containing about a pound of marijuana and two to three pounds of methamphetamine. Tr. 65. He also recovered a gun. Tr. 66. Wardell placed Defendant under arrest, advised him of his <u>Miranda</u> rights, and transported him to Troop G for questioning. Tr. 66.

**The Motion to Suppress**

Defendant does not argue that the traffic stop was not justified at its inception. Trooper Wardell had reasonable suspicion to commence the traffic stop based on Defendant's speeding, improper lane usage, and following too closely. Instead, Defendant argues that Trooper Wardell impermissibly prolonged the traffic stop without developing further reasonable suspicion to justify detaining Defendant. Defendant argues that Trooper Wardell's roadside questioning constituted a custodial interrogation in violation of Miranda requirements. Defendant argues that the officers did not have probable cause to search the Nissan based on the traffic stop, the communications from the DEA, or the roadside questioning. Defendant contends that the probable cause came solely from the K-9 sniff and that the K-9 sniff constituted a trespass because the K-9 put his paws on the truck.

**Law and Analysis**

    **A. Extension of the Stop**

"The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in Terry v. Ohio, 392 U.S. 1 (1968)." United States v. Rosales-Giron, 592 Fed. Appx. 246, 250 (5th Cir. 2014); quoting United States v. Stevens, 487 F.3d 232, 244 (5th Cir. 2007). "Under Terry, we determine the reasonableness of an investigative stop by examining: (1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." Id. Only the second prong is at issue here.

An officer's actions are not reasonably related to the circumstances that justified the stop if the officer detains its occupants beyond the time needed to investigate those circumstances, unless the officer develops reasonable suspicion of additional criminal activity in the meantime. United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). If the officer develops reasonable suspicion of additional criminal activity during the investigation, the officer may further detain the occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion. Id.; United States v. Aguilera, 2014 WL 7404535, at *3 (N.D. Tex.).

Prior to the stop, Trooper Wardell had knowledge of the active drug investigation, the belief that the defendant was returning to Louisiana from Texas with illegal drugs, and Defendant's turn-around travel pattern. During the stop, Defendant gave conflicting and deflecting statements about his travel history and lied about his past criminal history. Based on the totality of these circumstances, Trooper Wardell developed additional suspicion of additional criminal activity and reasonably detained Defendant while he investigated.

### B. Roadside Questioning

An officer may examine driver's licenses and vehicle registrations and run computer checks as part of the investigation of the circumstances that originally caused the traffic stop. United States v. Pack, 612 F.3d 341, 349-350 (5th Cir. 2010). The officer may also ask about the purpose and itinerary of the occupant's trip as part of this investigation because these questions are considered to be reasonably related in scope to the investigation of the circumstances that caused the stop. Id. An officer may ask questions on subjects

unrelated to the circumstances that caused the stop, so long as the unrelated questions do not extend the duration of the stop. Id. The reasoning behind this rule is that the Fourth Amendment protects against detention, not questioning. Id. Thus, no Fourth Amendment harm is done where the officer asks the occupant of a vehicle questions that are unrelated to his reason for stopping the vehicle while waiting for routine computer checks to be processed. Id.

Trooper Wardell questioned Defendant about his travel itinerary. Tr. 62. He questioned Defendant for only a short period of time. The questioning took place in an open-air location beside a heavily trafficked highway, and the questions were non-accusatory in nature. Defendant was not physically restrained, and no statements were made demonstrating that Defendant was not free to leave or that he was required to answer Trooper Wardell's questions. The questioning did not violate Defendant's Fourth Amendment rights because it was reasonably related in scope to the investigation of the circumstances that caused the stop. Trooper Wardell was not required to issue Miranda warnings.

### C. The Open-Air Sniff

Defendant argues that the open-air sniff constituted a trespass because Samos put his paws on the Nissan during the sniff. Courts have held that a dog's "minimal and incidental contact" with the exterior of a car is not a search. See United States v. Olivera-Mendez, 484 F.3d 505, 511-12 (8th Cir. 2007) (where drug-sniffing dog jumped and placed his front paws on the body of the defendant's car during a walk-around sniff, holding that "[t]he sniff ... was comparable to other canine alerts evaluated by the Supreme Court, and

it did 'not rise to the level of a constitutionally cognizable infringement' ") and United States v. Stone, 866 F.2d 359, 364 (10th Cir. 1989) (holding that a dog's instinctive actions did not violate the Fourth Amendment where the dog jumped without encouragement into a vehicle through a door that the defendant left open).

Here, Deputy Brock Bonds testified that Samos jumped up and briefly put his paws on the Nissan to brace his fall. Tr. 35. Such an action does not constitute a trespass. Accordingly, the open-air sniff and alert was valid, and officers had probable cause to search Defendant's vehicle.

Accordingly,

It is recommended that Defendant's Motion to Suppress (Doc. 20) be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b). A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and

legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

    THUS DONE AND SIGNED in Shreveport, Louisiana, this 6th day of May, 2024.

_____
Mark L. Hornsby
U.S. Magistrate Judge